## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 04 2020, 8:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennie Scott
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Parent-Child Relationship of L.C. (Child) and M.H. (Mother);

M.H. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

February 4, 2020

Court of Appeals Case No.
19A-JT-1714

Appeal from the Delaware Circuit Court

The Honorable Kimberly S. Dowling, Judge

Trial Court Cause No.
18C02-1811-JT-135

**May, Judge.**

[1]     M.H. ("Mother")[1] appeals the involuntary termination of her parental rights to L.C. ("Child"). Mother challenges several of the trial court's findings, arguing they are not supported by the evidence. In addition, Mother contends the trial court's findings do not support its conclusions that the conditions under which Child was removed from Mother's care would not be remedied,[2] that termination was in Child's best interests, and that there exists a satisfactory plan for Child's care following the termination of Mother's parental rights.[3] We affirm.

## Facts and Procedural History

[2]     Child was born to Mother on December 27, 2015. Child was born at thirty-three weeks gestation and "required an extended hospital stay following his birth." (App. Vol. II at 34.) Upon his release from the hospital, Child lived

---

[1] J.C. ("Father") consented to Child's adoption and does not participate in this appeal.

[2] Mother also alleges the trial court's findings do not support its conclusion that the continuation of the Mother-Child relationship posed a threat to Child's well-being. Because we hold the trial court's findings supported its conclusion that the conditions under which Child was removed from Mother's care would not be remedied, we need not consider Mother's argument regarding whether the continuation of the parent-child relationship poses a risk to Child's well-being. *See In re L.S.*, 717 N.E.2d 204, 209 (Ind. Ct. App. 1999) (because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the court need find only one requirement to terminate parental rights), *reh'g denied, trans. denied, cert. denied* 534 U.S. 1161 (2002).

[3] Mother also argues the Department of Child Services ("DCS") did not prove that Child had been adjudicated a Child in Need of Services ("CHINS") on two separate occasions as required by Indiana Code section 31-35-2-4(b)(2)(B)(iii). Mother is correct – Child has been adjudicated a Child in Need of Services only one time. However, as Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, and we conclude the trial court's findings support its conclusion that the conditions under which Child was removed from Mother's care would not be remedied, DCS did not need also to prove that Child had twice been adjudicated a CHINS. *See In re L.S.*, 717 N.E.2d at 209 (because Indiana Code section 31-35-2-4(b)(2)(B) written in the disjunctive, court needs find only one requirement to terminate parental rights).

with Mother. Dr. Milissa Eley was Child's pediatrician and began seeing Child in February 2016. At Child's first visit, Dr. Eley observed Child was "underweight and struggling to meet his milestones." (*Id*.) Dr. Eley prescribed a high-calorie formula and spoke with Mother multiple times regarding proper feeding practices to encourage Child's proper weight gain. Dr. Eley ultimately concluded Child suffered from various medical issues, including "failure to gain weight and at high risk for failure to thrive . . . [and] physically and developmentally delayed." (*Id*. at 35.)

[3] On August 16, 2016, the Department of Child Services ("DCS") filed a petition alleging Child was a Child in Need of Services ("CHINS") based on Dr. Eley's diagnosis and because Mother had failed to bring Child to thirteen of his last fifteen appointments with Meridian Pediatric Rehabilitation, Mother's live-in boyfriend used illicit substances, and Father had tested positive for marijuana. Child remained in Mother's care. On September 9, 2016, the trial court adjudicated Child as a CHINS based on Mother's admission to all allegations except those related to boyfriend and to Father's use of drugs.

[4] On October 28, 2016, at his nine-month checkup, Child had lost five ounces since his weight check eight days earlier. Dr. Eley told Mother that Child should be admitted to the hospital immediately. Mother left Dr. Eley's office before Child could be admitted to the hospital. Dr. Eley contacted DCS, who took Child into emergency custody and placed him in foster care the same day. On October 31, 2016, Child was admitted to the hospital and began gaining weight.

[5]     On November 29, 2016, the trial court entered its dispositional decree in the CHINS proceeding. The trial court ordered Mother to, among other things,

> maintain suitable, safe and stable housing; secure and maintain a legal and stable source of income; complete a substance abuse assessment and follow recommendations; meet with medical/psychiatric personnel and meet personal[,] medical and mental health needs, as well as medical and mental health needs of [Child]; attend scheduled visitation with [Child] and follow visitation rules and procedures; and provide [Child] with a safe, secure and nurturing environment free from abuse and neglect.

(*Id*. at 36.) Mother was initially compliant in services and completed all assessments. However, Mother did not believe she needed assistance with her mental health or parenting skills, and she did not make any progress in services. Mother eventually stopped participating in services.

[6]     At the beginning of the proceedings, Mother's visitation with Child was unsupervised. However, on August 6, 2018, Mother's visits were changed to supervised "until [Mother] was compliant with visitation rules and had secured stable housing." (*Id*.) Mother did not return to unsupervised visits. After the visits became supervised, Mother started missing visits. Mother missed fifteen visits between August 6, 2018, and February 2019. At Mother's request, her visits were decreased to one per week in November 2018, and to once every other week in January 2019.

[7]     On November 30, 2018, DCS filed a petition to terminate Mother's parental rights to Child based on Mother's noncompliance with services. The trial court

held fact-finding hearings on the matter on February 21, 2019, March 21, 2019, and April 2, 2019. On July 1, 2019, the trial court entered its order terminating Mother's parental rights to Child.

# Discussion and Decision

## I. Standard of Review

[8] We review termination of parental rights with great deference. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh evidence or judge credibility of witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id*. In deference to the juvenile court's unique position to assess the evidence, we will set aside a judgment terminating a parent's rights only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied* 534 U.S. 1161 (2002).

[9] "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. A trial court must subordinate the interests of the parents to those of the children when evaluating the circumstances surrounding a termination. *In re K.S.*, 750 N.E.2d at 837. The right to raise one's own children should not be terminated solely because there is a better home available for the children, *id.*, but parental rights may be

terminated when a parent is unable or unwilling to meet parental responsibilities. *Id*. at 836.

To terminate a parent-child relationship, the State must allege and prove:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State must provide clear and convincing proof of these allegations. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009), *reh'g denied*. If the court finds the allegations in the petition are true, it must terminate the parent-child relationship. Ind. Code § 31-35-2-8.

When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of*

*Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We determine whether the evidence supports the findings and whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208. Mother challenges several findings and the trial court's conclusions that there was a reasonable probability that the conditions under which Child was removed from Mother's care would not be remedied, that termination was in Child's best interests, and that there existed a satisfactory plan for Child's care following termination of Mother's parental rights.

## II. Reasonable Probability Conditions Would Not Be Remedied

[12] A trial court must judge a parent's fitness to care for her child at the time of the termination hearing. *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). Evidence of a parent's pattern of unwillingness or lack of commitment to address parenting issues and to cooperate with services "demonstrates the requisite reasonable probability" that conditions will not change. *Lang v. Starke Cty. OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. Mother challenges a number of the trial court's findings related to its conclusion that the conditions under which Child was removed from Mother's care would not be remedied, which we discuss *infra*. She then argues the trial court's unchallenged findings do not support its conclusion.

### A. Finding 20

Mother challenges Finding 20 of the trial court's order, which states: "Dr. Eley concluded that [Child's] failure to thrive was not due to a medical condition but rather was the result of social and environmental factors while he was in Mother's care." (App. Vol. II at 35.) Mother directs us to testimony from Dr. Eley that supports Mother's contention that Child's failure to thrive was based on a medical condition and not environmental factors.

Dr. Eley testified that Child was born premature, and "feeding issues were an issue when he was a newborn from the beginning." (Tr. Vol. II at 46.) Additionally, Dr. Eley testified Child had reflux, which can cause vomiting and a child with reflux can have difficulty "retaining calories." (*Id.* at 47.) Dr. Eley also testified Child had anemia due to the feeding issues. Mother argues Dr. Eley's testimony indicates Child's failure to thrive is medical, and not environmental.

However, Mother's argument ignores Dr. Eley's other testimony, which supports the trial court's finding that Child's failure to thrive, while initially medical, was exacerbated by environmental factors, specifically, Mother failing to follow the doctor's recommendations regarding feeding practices for Child. Dr. Eley testified Mother did not pick up the high calorie formula prescribed to address Child's weight gain issues, Mother left with Child after an appointment during which Child had lost weight, and Dr. Eley had explained Child's feeding issues to Mother multiple times. Additionally, at the time of his removal from Mother's care, Child fell below the first percentile on the pediatrician's growth

chart, which charts a child's weight compared to a general standard. After some time in foster care, he was in the 25th percentile and hitting appropriate developmental milestones.

[16]     When asked for her medical opinion regarding the reason for Child's diagnosis as failure to thrive, Dr. Eley testified the diagnosis was not due to "medical reasons" and instead was due to "social reasons." (*Id*. at 55.) Mother's argument is an invitation for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court cannot reweigh the evidence or judge the credibility of witnesses). The evidence was sufficient to support this finding.

### B. Finding 33

[17]     Mother challenges a portion of Finding 33 of the trial court's order, which states in relevant part: "Mother has been unable to maintain safe, stable and suitable housing during the CHINS proceedings." (App. Vol. II at 36.) Mother directs us to testimony supporting her contention that she has maintained safe, stable, and suitable housing during the pendency of these proceedings. Specifically, Mother cites the testimony of Amber Coleman, one of the service providers, who stated Mother has "been in stable housing for a while." (Tr. Vol. II at 117.) Additionally, Family Case Manager Patrick Orto testified Mother's housing was "appropriate." (*Id*. at 153.) Mother also testified she had been living at her current residence for approximately one year.

Mother's argument ignores testimony contrary to Mother's own, including testimony that Mother had only been living at her current residence for approximately six months, and that Mother did not have "income to pay" for the apartment. (*Id.* at 47.) Further, other testimony supported the trial court's finding, including evidence that Mother moved multiple times during the CHINS proceedings -- from her Mother's house, to her boyfriend's, and then to an apartment. Family Case Manager Laura Bennett testified that, at one point during the proceedings, "[Mother] up and moved and did not let DCS know that she was moving prior." (*Id.* at 46.) Mother's argument is an invitation for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court cannot reweigh the evidence or judge the credibility of witnesses). The evidence supports this finding.

### *C. Finding 69*

Mother challenges Finding 69 of the trial court's order, which states:

> [Child] needs a safe, stable, secure and permanent environment in order to thrive. Mother has not shown the ability to provide [Child] with such an environment and has not demonstrated that she is able to provide a home free of neglect for [Child]. Mother's habitual patterns of conduct support the substantial probability of future neglect or deprivation of KS.

(App. Vol. II at 39) (internal citation omitted). Mother argues DCS did not present evidence to support this finding, and "there is no child in this matter named K.S." (Br. of Appellant at 22.) This case involves no child named K.S.;

however we interpret this singular reference to "K.S." as a scrivener's error, which cannot be used to defeat a judgment. *See McBride v. Monroe Cty. Ofc. of Family & Children*, 798 N.E.2d 185, 200 (Ind. Ct. App. 2003) (typographical error in trial court's finding does not corrupt judgment).

[20] Regarding evidence to support the trial court's finding, DCS presented evidence Mother had difficulty maintaining stable employment, as she held jobs for only four or five months at a time; she relied on her ex-boyfriend for financial support; and she did not seem to retain much of the information discussed as part of parenting-related services. Mother's argument is an invitation for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court cannot reweigh the evidence or judge the credibility of witnesses). The evidence was sufficient to support this finding.

### D. *Remainder of the Trial Court's Findings*

[21] Additionally, we note the plethora of unchallenged trial court findings that support the trial court's decision to terminate Mother's parental rights. *See Matter of A.C.B.*, 598 N.E.2d 570, 573 (Ind. Ct. App. 1992) (affirming termination of parental rights despite erroneous findings because other findings supported termination). Such findings include:

> 11. DCS filed a Petition Alleging Child to be In Need of Services on August 16, 2016 under Cause 18C02-1608-JC-000234 ("CHINS proceeding") alleging that since birth, [Child] had remained below the 1% for weight; that [Child] is unable to sit up without assistance; that [Child] has missed thirteen (13) of fifteen

(15) appointments with Meridian Pediatric Rehabilitation for feeding treatment, physical therapy evaluation and occupational therapy evaluation; that Mother's live-in boyfriend, [K.Y.], uses illicit substances including but not limited to marijuana; that Father exercises limited visitation with [Child]; and that Father tested positive for marijuana.

\* \* \* \* \*

15. At a weight check on October 28, 2016, [Child] had lost 5 ounces from his prior weight check. [Child] should have been gaining approximately ½ to 1 ounce per day.

16. Dr. Eley recommended that [Child] be admitted directly to the hospital from the October 28, 2016 weight check appointment, but Mother left Dr. Eley's office with [Child] before he could be admitted.

17. [Child] was subsequently removed from Mother's care on an emergency basis on October 28, 2016 and was placed into foster care.

18. On October 31, 2016, [Child] was admitted to the hospital, and he began gaining weight.

19. [Child] has continued to gain weight while in foster care, and he is currently in the 25th percentile for height and weight.

\* \* \* \* \*

22. FCM Bennett determined that Mother needed assistance with parenting education. FCM Bennett observed that Mother was unable to care for [Child] and appeared to have difficulty understanding, processing and remembering basic parenting

instructions or directions. Mother was unable to properly mix formula for [Child] and routinely forgot instructions she was given regarding how to care for [Child].

* * * * *

28. At the Periodic Case Review on February 6, 2017, Mother had recently tested positive for marijuana and had not attended [Child's] therapy appointments. Mother was visiting with [Child]. Mother had been offered therapy and parenting education, as well as the opportunity to participate in [Child's] medical visits and therapies.

* * * * *

39. On August 24, 2017, Mother completed an evaluation of her cognitive, academic and social-emotional functioning, as well as an evaluation of her parenting style and beliefs, with Dr. Crystal Hicks from Anchor Behavioral Counseling.

40. Dr. Hicks determined that Mother holds inappropriate expectations for children and is at risk of reversing family roles. Specifically, Mother may tend to treat children more as peers and use child to help meet self-needs.

41. Diagnostic impressions from Mother's assessment were Borderline Intellectual Functioning and Unspecified Anxiety Disorder. Mother's global cognitive functioning fell within the borderline range and revealed that Mother will likely have greater difficulty than her peers in effective problem solving and interacting with her environment.

42. Mother's responses during the evaluation indicated the presence of paranoia and extreme guardedness, and Dr. Hicks

determined that Mother is likely experiencing psychological problems she is not reporting.

* * * * *

46.  During her home-based casework, Mother required frequent re-direction and was very resistant to the service.  Mother would make some progress, then digress.  Mother cancelled multiple home-based casework sessions (approximately 10 sessions) and multiple scheduled visitations with [Child] (approximately 15 sessions).

47.  During the time Mother was working with Lifeline Family Consultant, she was behind on her rent and facing eviction.  Mother was resistant to setting and maintaining a financial budget and resistant to assistance with money management.

* * * * *

49.  Mother engaged in home-based therapy with Amy Kelly from Cornerstone between October 2016 and November 2018.  Mother's initial goal with Ms. Kelly, as established by Mother, was to get DCS out of her life.  Mother later added goals of addressing anxiety, depression and anger.  Mother made some progress, but would then regress.

50.  After Mother and [K.Y.] ended their relationship, Mother became less consistent with her therapy with Ms. Kelly.

51.  Mother was often inconsistent in attending her visitation with [Child].  In late 2018, Mother only attended approximately half of the scheduled supervised visits with [Child].

52. Mother often caused friction between herself, DCS, CASA [Court Appointed Special Advocate] and service providers.

\* \* \* \* \*

54. Mother was financially dependent on others, including [K.Y.].  Financial instability, housing instability and poor decision-making continued to be barriers for Mother.

55. Mother reported to FCM Orto that she often met men online and convinced them to give her money.

56. Mother was dishonest with DCS, CASA and service providers about her housing, employment and/or financial situation.

\* \* \* \* \*

60. Mother continued to be inconsistent in attending her supervised visits with [Child].  At Mother's request, her visitation with [Child] was reduced to one visit every other week.

(App. Vol. II at 34-8.)  As Mother does not challenge these findings, we accept them as true.  *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) ("Because Madlem does not challenge the findings of the trial court, they must be accepted as correct.").

[22]  The trial court's findings overwhelmingly support the trial court's conclusion that the conditions under which Child was removed from Mother's care would not be remedied.  Thus, the conclusion was not erroneous.  *See In re G.M.*, 71

N.E.3d 898, 908 (Ind. Ct. App. 2017) (affirming the trial court's conclusion that the conditions under which child was removed from mother's care would not be remedied based on mother's pattern of behavior and noncompliance with services).

## III. Child's Best Interests

In determining what is in Child's best interests, a trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010), *trans. dismissed*. A parent's historical inability to provide a suitable environment, along with the parent's current inability to do so, supports finding termination of parental rights is in the best interests of the child. *In re A.L.H.*, 774 N.E.2d 896, 990 (Ind. Ct. App. 2002). The recommendations of a DCS case manager and court-appointed advocate to terminate parental rights, in addition to evidence that conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in Child's best interests. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

Mother argues termination of her parental rights is not in Child's best interests because she "was not given a chance to reunify" with Child and DCS "did not work this case to reunify" Child with Mother. (Br. of Appellant at 28.) To the extent Mother's argument impugns the services offered to her as part of the CHINS proceedings, a challenge to the services offered by DCS pursuant to the CHINS adjudication is not a ground by which a parent can attack the

involuntary termination of that parent's rights to a child. *See In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009) ("failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law"). Further, as indicated *supra*, over the three years this matter has been pending, Mother was offered and participated in many services, but she had not demonstrated any progress in the skills she needed to reunify with Child.

[25] Further, the CASA testified termination of the parent-child relationship was in Child's best interests because she believed "[Mother] is either unwilling or unable to take care of [Child] and insure [sic] his health and well-being." (Tr. Vol. III at 4.) Family Case Manager Zach Rozelle testified termination was in Child's best interests and, when asked about Child in the foster care setting, he testified Child appeared "very comfortable, very at home[.]" (*Id.* at 51.) The trial court found Child gained weight in foster care and Child was "thriving" in his current placement. (App. Vol. II at 39.) Based thereon, we conclude the trial court's findings support its conclusion that termination of Mother's parental rights to Child was in Child's best interests. *See In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009) (recommendation of termination by DCS case worker and CASA coupled with conclusion that parent would not remedy the conditions under which child was removed was sufficient to terminate parent's rights to child).

## IV. Satisfactory Plan for Care Following Termination

[26] Pursuant to Indiana Code section 31-35-2-4(b)(2)(D), parental rights cannot be terminated unless DCS provides sufficient evidence of a satisfactory plan for the care and treatment of the child following termination. Mother argues DCS did not provide a satisfactory plan for Child's care following termination because the "case manager did not go into detail about the child or the child's plan." (Br. of Appellant at 28.) Regarding this issue, the trial court found: "The Indiana DCS has a satisfactory plan for the care and treatment of the child, which includes adoption." (App. Vol. II at 40.)

[27] Adoption is a sufficient plan for a child's care following termination of a parent's rights. *See In re S.L.H.S.*, 885 N.E.2d 603, 618 (Ind. Ct. App. 2008) (adoption is satisfactory plan for child's care and treatment after termination). Additionally, such a plan "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re Termination of Parent-Child Relationship of D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied*. We find no error in the court's conclusion.

## Conclusion

[28] DCS presented evidence that supported the findings challenged by Mother. Further, the trial court's findings supported its conclusions that the conditions under which Child was removed would not be remedied and that termination was in Child's best interests. Finally, the proffered plan of adoption was

sufficient evidence of a satisfactory plan for Child's placement and care following termination of Mother's parental rights. Accordingly, we affirm the involuntary termination of Mother's parental rights to Child.

[29] Affirmed.

Crone, J., and Pyle, J., concur.